[Cite as *State v. Warren*, 2026-Ohio-1399.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| STATE OF OHIO | : |
| | : C.A. No. 30539 |
| Appellee | : |
| | : Trial Court Case No. 1994 CR 03533 |
| v. | : |
| | : (Criminal Appeal from Common Pleas |
| RAYMOND WARREN | : Court) |
| | : |
| Appellant | : **FINAL JUDGMENT ENTRY &** |
| | : **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on April 17, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
RONALD C. LEWIS, PRESIDING JUDGE

TUCKER, J., and EPLEY, J., concur.

JOANNA L. SANCHEZ and PATRICK T. CLARK, Attorneys for Appellant
ANDREW T. FRENCH, Attorney for Appellee

LEWIS, P.J.

{¶ 1} Raymond Warren appeals from an order of the Montgomery County Common Pleas Court that on remand denied his application for postconviction DNA testing.   For the following reasons, we affirm the judgment of the trial court.

## I.      Facts and Course of Proceedings

{¶ 2} A jury found Warren guilty of murder, with a firearm specification, in 1995, and the trial court imposed an aggregate sentence of 18 years to life in prison.   We affirmed the conviction on direct appeal.   *State v. Warren*, 1996 WL 612858 (2d Dist. Oct. 25, 1996).

{¶ 3} Approximately 17 years after this court affirmed his conviction, Warren sought a new trial based on newly discovered evidence, including the affidavits of two witnesses who recanted their trial testimony.   The witnesses averred that Warren did not kill the victim and that they had told police otherwise because police threatened to charge them with murder.   Warren also included a publication challenging the reliability of gunshot-residue evidence.   The trial court ultimately held a hearing on Warren's motion for leave to file a motion for new trial.   Based on the evidence presented, the trial court overruled Warren's motion for leave.   We affirmed the trial court's judgment.   *State v. Warren*, 2019-Ohio-3522 (2d Dist.).

{¶ 4} On June 15, 2021, Warren filed an application for postconviction DNA testing of the three shell casings recovered from the crime scene.   He argued that he met all the statutory requirements to have the shell casings tested for "touch DNA."   He maintained

2

that an "exclusion result" showing that someone other than him had touched the shell casings would be "outcome determinative" in his case, meaning that no reasonable factfinder would have found him guilty.

{¶ 5} The trial court denied Warren's application. The court found "no evidence to suggest that biological material was collected from the crime scene" for potential DNA testing. The court considered an opinion from the crime laboratory regarding the suitability of testing the shell casings for DNA, a July 16, 2021 letter written by Kristin Nestor, who was then the Laboratory Supervisory and DNA Technician Leader at the Miami Valley Regional Crime Laboratory ("MVRCL"). The court found that it was required to accept the crime laboratory's opinion that the shell casings had been contaminated since their collection and were unsuitable for DNA testing. The court concluded that a test result excluding Warren as the source of DNA on the shell casings would not be outcome determinative in his case.

{¶ 6} Warren timely appealed from the trial court's denial of his application. He argued that the trial court abused its discretion in (1) finding no evidence to suggest that biological material was collected from the crime scene, (2) accepting the crime laboratory's determination that the shell casings had been contaminated and were unsuitable for DNA testing, and (3) ruling that a DNA testing exclusion result would not be outcome determinative.

{¶ 7} On appeal, we reversed the decision of the trial court and remanded the case for further proceedings. *State v. Warren*, 2022-Ohio-4743 (2d Dist.). We concluded that the trial court abused its discretion "in finding that it 'must accept' the crime laboratory's determination that the shell casings at issue are contaminated and unsuitable for testing." *Id.* at ¶ 3. Accordingly, we reversed the trial court's judgment denying Warren's application and remanded the case "to the trial court to review the [crime lab's] determination to ensure

3

that the crime lab's conclusion is supported and grounded in fact." *Id.* at ¶ 31. We left to the trial court's discretion whether and how to take additional evidence on the issue. *Id.* We did not address Warren's argument that an exclusion result would be outcome determinative, reserving consideration of that issue for after the trial court's compliance with our mandate on remand. *Id.* at ¶ 29.

{¶ 8} On January 9, 2023, the trial court held a hearing at which Elizabeth Benzinger, the Director of Research, Development, and Training at the Ohio Bureau of Criminal Investigation, testified. She answered a number of hypotheticals about whether touching shell casings without gloves could have eliminated or added DNA to the casings. She answered most of the questions with "potentially" and conceded that she did not have personal knowledge of whether the firearms examiner in this case used gloves while evaluating the casings prior to trial.

{¶ 9} The trial court also received and considered a February 24, 2023 affidavit of Detective Gary Engel and a May 12, 2023 report authored by Benzinger. Considering all the evidence before it, the trial court stated that it could not conclude "that the parent sample of the biological material that may be present on the casings in this case has not been contaminated to the extent that it has become scientifically unsuitable for testing, and the parent sample otherwise has been preserved, and remains, in condition that is scientifically suitable for testing." Decision (June 5, 2025), p. 10. The trial court also stated that it "cannot find that if DNA testing is conducted and an exclusion result is obtained, the result of the testing will be outcome determinative regarding the Defendant." *Id.* Therefore, the trial court again denied Warren's application for postconviction DNA testing. Warren filed a timely appeal.

4

**II.     The Trial Court Did Not Abuse Its Discretion When It Denied Warren's Application for Postconviction DNA Testing**

{¶ 10} Warren's sole assignment of error states:

The trial court abused its discretion when it denied Mr. Warren's application for DNA testing.

{¶ 11} "A trial court has discretion to accept or reject an application for DNA testing." *Warren*, 2022-Ohio-4743, at ¶ 12 (2d Dist.), citing R.C. 2953.74(A).   Thus, absent an abuse of discretion, we will not reverse the trial court's decision.   "A trial court abuses its discretion when it acts in an unreasonable, arbitrary or unconscionable manner."   *State v. Finnerty*, 45 Ohio St.3d 104, 107 (1989).

{¶ 12} Warren makes several arguments in his assignment of error.   First, Warren contends that the trial court exceeded the scope of our remand by accepting more evidence and starting "the suitability determination process anew."   Appellant's Brief, p. 11. According to Warren, "[w]hen evaluating suitability for testing in the first instance, Ms. Nestor and the MVRCL could not have relied on [Engel's] affidavit, BCI's visual examination, or BCI's report to conclude that the DNA was 'likely obliterated,' and thus, each of these pieces of evidence was irrelevant to the limited issue on remand."   *Id.* at 11-12.

{¶ 13} In our previous decision, we left to the trial court's discretion whether and how to take additional evidence on the issue of suitability for testing under R.C. 2953.74(C)(2)(c). On remand, the trial court decided to accept evidence from Benzinger and Detective Engel to help it determine the question before it on remand.   This evidence was relevant to the issue before the trial court on remand, and we conclude that the trial court did not abuse its discretion by receiving and considering this evidence.

5

**{¶ 14}** Second, Warren argues that the trial court's determination that the shell casings were not suitable for testing was not supported by sound reasoning or the record. According to Warren, Benzinger's report and testimony do not support the trial court's finding that the shell casings were not suitable for testing. Warren further argues that Engel's affidavit, like Nestor's letter, did not establish that the shell casings were actually touched by individuals without gloves between the time of collection at the crime scene and the present.

**{¶ 15}** Postconviction DNA testing is governed by R.C. Chapter 2953. Relevant to this appeal, "R.C. 2953.74(C) provides additional requirements that must be met before a trial court 'may accept' an application for DNA testing." *State v. Curtis*, 2015-Ohio-2460, ¶ 10 (12th Dist.). "Unless the inmate meets that burden, the trial court is statutorily precluded from accepting the inmate's post-conviction application for DNA testing." *Id.*, citing R.C. 2953.74(B) and (C), *State v. Buehler*, 2007-Ohio-1246, ¶ 30, and *State v. Carter*, 2007-Ohio-6858, ¶ 17 (10th Dist.).

**{¶ 16}** The issue in this appeal, and the issue on which we remanded the case to the trial court, concerns R.C. 2953.74(C)(2)(c), which provides, in pertinent part:

(C) If an eligible offender submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if all of the following apply:

. . .

(2) The testing authority determines all of the following pursuant to section 2953.76 of the Revised Code regarding the parent sample of the biological material described in division (C)(1) of this section:

. . .

6

(c) The parent sample of the biological material so collected has not degraded or been contaminated to the extent that it has become scientifically unsuitable for testing, and the parent sample otherwise has been preserved, and remains, in a condition that is scientifically suitable for testing.

The determination of whether the parent sample has been degraded or contaminated to the extent that it has become scientifically unsuitable for testing shall be made by the testing authority. R.C. 2953.76(B).

{¶ 17} In our prior decision, we addressed Nestor's July 16, 2021 letter, in which she concluded that the shell casings were unsuitable for DNA testing. She opined, "Because the fired casings were handled without gloves by the firearms examiner at the time of comparison, any DNA that may have been present has likely been obliterated. Additionally, extraneous DNA from the examiner and any other items handled in the relative time period could be sources of contamination." Nestor noted that Timothy S. Duerr, a forensic scientist employed at MVRCL, referenced the three fired casings in his report dated August 17, 1994.

{¶ 18} Based on our review of Nestor's letter and the record as a whole, we reversed the trial court's initial denial of Warren's application for postconviction DNA testing. We explained:

There is no indication in the record that anyone from MVRCL went to the trial court property room, where the shell casings are being stored, to conduct any examination, visual or otherwise, in connection with Warren's application. More importantly, we see nothing in the record to support the one-line assertion in the crime-lab supervisor's July 16, 2021 letter that "the fired casings were handled without gloves by the firearms examiner at the time of comparison."

7

*Warren*, 2022-Ohio-4743, at ¶ 24 (2d Dist.). We further noted that the trial transcript reflected that the evidence technician who collected the shell casings at the scene wore gloves. As a result, we concluded that "[a]bsent an explanation from the crime-lab representative detailing her basis of knowledge or some record evidence establishing that the firearms examiner did not wear gloves, we decline to affirm the trial court's judgment on the basis that the shell casings have been contaminated." *Id.* at ¶ 25. We remanded the case to the trial court "to review the MVRCL's determination to ensure that the crime lab's conclusion is supported and grounded in fact." *Id.* at ¶ 31. We left to the trial court's discretion "whether and how to take additional evidence on the issue." *Id.*

{¶ 19} On remand, the trial court held a hearing at which Benzinger testified. After the hearing, the trial court also accepted and considered a February 24, 2023 affidavit of Detective Gary Engel and a May 12, 2023 report prepared by Benzinger. Engel's affidavit stated that he was the lead detective in the 1994 investigation of Warren's murder of Wendell Simpson. He explained that "it was routine during pretrials with evidence technicians and firearm experts to open and examine the evidence, including casings that would be used for trial." He also noted that "in 1994 and 1995 we did not wear gloves when handling items of evidence in pretrials" and that "[i]n 1994 and 1995 law enforcement, prosecutors and defense attorneys did not wear gloves when handling items in Court for the jury to view." Nor did Engel "recall the Court ever instructing a jury to wear gloves during jury deliberation."

{¶ 20} In her May 12, 2023 report, Benzinger stated, in part:

Based on information received regarding standard evidence handling practices during the time period of 1994-1995, the casings are at substantial risk of contamination from crime scene technicians, firearms examiners, attorneys and jury members (either by their own DNA or others' DNA

8

incidentally present on their hands). There is the possibility that the pens used to mark the casings carried DNA from a previously examined case. As pointed out by Nestor, each time a casing is handled, there is also the potential to remove DNA already present.

It cannot be determined whether DNA testing on the casings will be successful without actually performing the testing. Should a DNA profile be obtained, it cannot be determined when that DNA was applied to the casing or under what circumstances. The suitability determination cannot be made without acknowledging the concerns of both the prosecution and the defense. A very thorough review of evidence is in the interest of justice in the post-conviction setting, but at the same time, it is not helpful to inject unreliable testing results into a case.

The chart below illustrates the range of potential testing outcomes for the casings. While the potential for recovering a profile unrelated to the case is present, the charge suggests a path forward for safely recovering probative profiles.

At the end of her report, Benzinger laid out a chart as to how to potentially proceed if (1) no DNA profile was obtained or a DNA profile was uninterpretable; (2) a partial profile was obtained and a comparison could be made but it did not meet CODIS upload requirements; or (3) a partial profile was obtained and it was sufficient for CODIS upload.

{¶ 21} The trial court interpreted Benzinger's report as weighing against a finding under R.C. 2953.74(C)(2)(c) that the casings were suitable for testing. Specifically, the trial court explained:

Per the mandate of the Second District Court of Appeals upon remand, this

9

Court directed BCI to conduct a visual inspection of the three shell casings at issue, as well as any and all other records relating to the handling of that evidence. Once Dr. Benzinger's investigation and visual examination was complete, she submitted a report detailing her findings, specifically that the three shell casings are unsuitable for DNA testing. In doing so, Dr. Benzinger relied upon the affidavit of Detective Gary Engel, the lead detective on Defendant's case, when making her determinations. Detective Engel averred that because touch DNA was not a consideration in 1994 and 1995, police officers, lawyers, evidence technicians, and other court personnel did not wear gloves when handling physical evidence during pretrial hearings. Simply put, Detective Engel's affidavit supports the conclusion that given the potentially high number of individuals who handled the shell casings over the years while not wearing gloves, it would be highly unlikely that said shell casings would be suitable for touch DNA testing. As directed by the Second District, the Court has reviewed the Suitability for Testing Report submitted by Dr. Benzinger and finds the information and conclusions contained therein to be credible.

Decision (June 5, 2025), p. 9. Based on the evidence before it, the trial court concluded that it "cannot find that the parent sample of the biological material that may be present on the casings in this case has not been contaminated to the extent that it has become scientifically unsuitable for testing . . . ." *Id.* at 10. Therefore, the trial court denied Warren's application.

{¶ 22} Warren argues the trial court erroneously stated that Benzinger concluded in her report that the three shell casings are unsuitable for testing. While we agree with Warren that Benzinger did not use those precise words in her report, we do not agree with

10

Warren's contention that the trial court abused its discretion by finding that the requirement of R.C. 2953.74(C)(2)(c) was not met. When the trial court first considered Warren's application for postconviction DNA testing, Nestor opined that the casings were unsuitable for testing because the firearms examiner did not wear gloves when he examined casings. At the time of our prior decision, there was no support in the record for this statement that the firearms examiner did not wear gloves. On remand, Detective Engel provided some support for this statement in his affidavit when he described that it was routine in 1994 and 1995 for firearm experts and evidence technicians to open and examine the evidence before trial. Engel's affidavit also indicated that law enforcement, prosecutors, and defense attorneys did not wear gloves when handling items in court for the jury to view. Further, Benzinger noted in her report that there were pen markings on the shell casings, which could have contained DNA from other cases. This was additional evidence that the three shell casings had potentially been made unsuitable for testing due to contamination since their collection. *See State v. Noling*, 2018-Ohio-795, ¶ 59, 62 (affirming the trial court's finding that shell casings were unsuitable for testing where they had been written on with a presumed non-sterile pen and they "had been examined previously by latent-print and firearms examiners who had not taken precautions to minimize contamination"). Benzinger considered all of this evidence and concluded that the shell casings were "at substantial risk of contamination." She also stated that "it is not helpful to inject unreliable testing results into a case."

{¶ 23} We are reminded that the trial court may not approve an application for DNA testing unless the "parent sample of the biological material so collected has not degraded or been contaminated to the extent that it has become scientifically unsuitable for testing, and the parent sample otherwise has been preserved, and remains, in a condition that is

11

scientifically suitable for testing." R.C. 2953.74(C)(2)(c). This determination is left for the testing authority. R.C. 2953.76(B). On remand, the trial court had before it an opinion from Nestor, a representative of a testing authority, stating that the casings were unsuitable for testing and an opinion from Benzinger, a representative of a testing authority, identifying the substantial risk of contamination. These opinions were buttressed by the affidavit of Detective Engel. The trial court did not have before it an opinion from a testing authority stating that the casings were scientifically suitable for testing.

{¶ 24} On the record before us, we cannot conclude that it was unreasonable for the trial court to find that the requirement of R.C. 2953.74(C)(2)(c) had not been satisfied. Therefore, the trial court did not abuse its discretion in denying Warren's application for postconviction DNA testing. R.C. 2953.74(C). We emphasize that our holding in this appeal is based on the unique record before us and the deferential standard of review that we are required to apply when reviewing a trial court's ruling on an application for postconviction DNA testing.

{¶ 25} Finally, Warren contends that the trial court abused its discretion by finding that the testing of the shell casings would not be outcome determinative. Given our conclusion that the trial court did not abuse its discretion by denying Warren's application on the basis of R.C. 2953.74(C)(2)(c), we need not resolve whether such testing would be outcome determinative.

{¶ 26} The assignment of error is overruled.

III. Conclusion

{¶ 27} Having overruled the assignment of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .

12

TUCKER, J., and EPLEY, J., concur.